**ANTONIA M. APPS
REGIONAL DIRECTOR
Tejal D. Shah
Liora Sukhatme
Travis Hill
Mary Kay Dunning
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-5039 (Dunning)
dunningm@sec.gov**

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                              **Plaintiff,**<br><br>        -against-<br><br>**KEN PETERMAN,**<br><br>                              **Defendant.** | <u>**COMPLAINT**</u><br><br>**24 Civ. 8475**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Ken Peterman ("Peterman"), alleges as follows:

**SUMMARY**

1. Defendant Peterman—the former chief executive officer ("CEO"), chair of the Board of Directors ("Board"), and president of Comtech Telecommunications Corp. ("Comtech")—engaged in insider trading by selling his Comtech stock on the basis of material non-public information about Comtech's negative earnings results before Comtech publicly announced them.

2. On March 4, 2024, Peterman attended a meeting of the Comtech Board's Audit Committee and received confidential oral and written presentations. The presentations revealed that Comtech's forthcoming financial results for the quarter that had ended on January 31, 2024 (the second quarter of Comtech's fiscal year 2024, or "Q2 FY24") would show a 12% decrease in net sales from the prior quarter, among other negative earnings results.

3. At the time, Comtech had two trading blackouts in effect (each for different reasons) that prohibited Peterman from trading in Comtech securities. One of the blackouts—a recurring quarterly trading blackout designed to prevent Comtech officers and directors from trading their Comtech shares while Comtech was finalizing its earnings results for the prior quarter but before it had publicly announced them—would continue until the second business day after Comtech's public announcement of its earnings results for Q2 FY24. Peterman had previously certified that he had read the Comtech conduct policy that explained this blackout period, and his own remarks at the beginning of the policy underscored employees' personal responsibility for complying with the conduct standards, including this blackout period.

4. On the evening of March 12, 2024, two Comtech directors informed Peterman that the Board had terminated him for cause effective immediately.

5. Hours later, Peterman tried to trade ahead of Comtech's announcement of his termination by placing a market order to sell all 8,241 Comtech shares in his equity compensation management account (the "Compensation Account").

6. On Wednesday, March 13, 2024, at approximately 9:00 a.m., Comtech issued a press release announcing Peterman's termination.

7. On Wednesday, March 13, 2024, at approximately 9:35 a.m., Peterman's brokerage firm began selling the shares of Comtech stock in Peterman's Compensation Account.[1] Within 25 minutes, all of Peterman's shares in this account had been sold for net proceeds of $40,454.54 at a weighted average price of $4.94 per share. On Monday, March 18, 2024, after the market close, Comtech publicly filed its Form 10-Q announcing its negative earnings results for Q2 FY24.

8. The next day, Comtech's stock price closed at $3.43 per share, dropping 25.4% from the previous day's closing price of $4.60 per share.

9. By selling his Comtech stock with knowledge of Comtech's forthcoming material non-public negative earnings results, Peterman breached his duty of trust and confidence to Comtech and its shareholders and avoided losses of approximately $12,445.44. Peterman would have avoided significantly more losses had he succeeded in his attempts to similarly sell additional shares of Comstock stock he held in a different account.

**VIOLATIONS**

10. By virtue of the foregoing conduct and as alleged further herein, Peterman violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

11. Unless Peterman is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

**NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

12. The Commission brings this action pursuant to the authority conferred upon it by

---

[1] All times set forth herein are in Eastern Time.

Exchange Act Sections 21(d) and 21A [15 U.S.C. §§ 78u(d) and 78u-1(a)].

13. The Commission seeks a final judgment: (a) permanently enjoining Peterman from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering Peterman to disgorge all ill-gotten gains he received as a result of the violations alleged herein and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Peterman to pay civil money penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]; (d) permanently prohibiting Peterman from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

**JURISDICTION AND VENUE**

14. This Court has jurisdiction over this action pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa].

15. Peterman, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

16. Venue lies in this District under Exchange Act Section 27 [15 U.S.C. § 78aa], because certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred in the Eastern District of New York. Among other things, Peterman received the material non-public earnings information at issue in this case at an in-person meeting in Melville, New York.

**DEFENDANT**

17.    **Peterman**, age 67, resides in Encinitas, California. Peterman served as president and CEO of Comtech from August 10, 2022, until March 12, 2024, when he was terminated for cause.

**RELEVANT ENTITY**

18.    **Comtech** is a Delaware-incorporated global technology company whose corporate headquarters were located in Melville, New York until March 2024, when Comtech relocated its corporate headquarters to Chandler, Arizona. Comtech provides terrestrial and wireless network solutions, next-generation 9-1-1 emergency services, satellite and space communications technologies, and cloud native capabilities to commercial and government customers. Comtech's common stock is listed on the NASDAQ Stock Market LLC stock exchange and trades under the symbol "CMTL."

**FACTS**

**I.    As Peterman Knew, He Had a Duty to Protect Comtech's Confidential Information and to Refrain from Trading on Comtech's Material Non-public Information.**

19.    On May 10, 2022, Peterman was appointed to Comtech's Board.

20.    On July 25, 2022, he was named chair of the Board.

21.    On August 10, 2022, Peterman was named president and CEO of Comtech.

22.    As Comtech's CEO, chair of the Board, and president, Peterman owed a duty of trust and confidence to Comtech and its shareholders to maintain the confidentiality of Comtech's material non-public information and to refrain from trading on it.

23.    On September 12, 2022, Comtech and Peterman entered into an employment agreement ("Employment Agreement") that Peterman signed.

24.    The Employment Agreement made clear that Peterman would have access to

"Confidential Information," defined as "information that constitutes trade secrets, is of a confidential nature, is of great value to [Comtech] or is the foundation on which the business of [Comtech] is predicated."

25.     In the Employment Agreement, Peterman agreed not to disclose Confidential Information "during his employment and thereafter" to anyone other than Comtech's employees or lawyers or others authorized by Comtech to receive Confidential Information. He also agreed not to "use for any purpose, other than the performance of [the Employment], any Confidential Information."

26.     The Employment Agreement made clear that its provisions governing Confidential Information "survive[d] the termination, expiration or cancellation of [Peterman's] employment."

27.     In September 2022, Comtech issued and distributed to its employees its Standards of Business Conduct ("Conduct Standards"), a set of policies that applied to all employees of Comtech.

28.     The Conduct Standards contained an introductory message from Peterman underscoring each employee's personal responsibility for complying with the standards:

> These Standards of Business Conduct are a guide to help all employees of Comtech live up to our high ethical standards…. At Comtech, each of us has the personal responsibility to make sure that our actions abide by these Standards of Business Conduct, as well as the specific laws and Company policies and procedures that apply to our roles.

29.     The Conduct Standards prohibited trading in Comtech securities while in possession of material non-public information.

30.     Specifically, in the section titled "Confidential Information and Securities Law," the Conduct Standards stated:

> 'Insider trading' is the purchase or sale of a publicly traded security while

6

> in possession of important non-public information about the issuer of the security. 'Tipping' is communicating such information to anyone who might use it to purchase or sell securities. No employee may engage in either insider trading or tipping.
>
> Employees who have questions pertaining to the sale or purchase of Company securities under circumstances where confidential information or securities laws may be involved should consult with the Company's Corporate Chief Financial Officer or Corporate Compliance Officer. When in doubt, information obtained as an employee of the Company should be presumed to be important and not public.

31. During Peterman's employment at Comtech, Comtech required all of its employees each year to complete online training about the Conduct Standards and "to electronically certify that they have received and read the [Conduct Standards] and that they have and will abide by these [Conduct Standards] as well as the specific laws and Company policies and procedures that apply to them and their roles."

32. The online training about the Conduct Standards contained an accompanying quiz. The quiz contained a question requiring employees to acknowledge and certify that they had received and read the Conduct Standards, including the provisions relating to insider trading, and that they had and would abide by the Conduct Standards, "as well as the specific laws and Company policies and procedures that apply to them and their roles."

33. The quiz also alerted employees that the "online electronic acknowledgement and certification of the [Conduct] Standards is considered equivalent to an actual written signature" and "is considered legally binding."

34. On December 26, 2023, Peterman completed and certified that he had completed the "Standards of Business Conduct Training FY 2024" for Comtech's fiscal year 2024.

**II.     Peterman Obtained Shares of Comtech Stock Through His Employment.**

35. Pursuant to the Employment Agreement, Comtech granted Peterman 42,518 Comtech restricted stock units that vested on an annual basis over three years and a $1 million

bonus to purchase Comtech stock in the open market.

36. On January 11, 2023, Peterman used his $1 million signing bonus to purchase 44,000 shares of Comtech common stock in the open market, and on June 13, 2023, he purchased another 5,400 shares.

37. Following these purchases, Peterman owned a total of 49,400 shares of Comtech common stock, which he held in an account under his and his wife's names at a large brokerage firm (the "Joint Account").

38. As the CEO of Comtech, Peterman was an "affiliate" of Comtech for purposes of Rule 144 promulgated under the Securities Act of 1933.

39. As such, the Comtech shares Peterman held in the Joint Account were considered control securities under Rule 144.

40. Therefore, the brokerage firm that held Peterman's Joint Account would not allow Peterman to sell the Comtech shares in this account without prior written approval from Comtech.

41. On September 12, 2023, Peterman's one-year employment anniversary, Comtech released 14,173 restricted stock units to Peterman.

42. Of this amount, Comtech withheld 5,932 restricted stock units to cover Peterman's tax liability and converted 8,241 restricted stock units into 8,241 shares of Comtech common stock.

43. Peterman held these 8,241 Comtech shares in his Compensation Account, held at a different brokerage firm from the one that held his Joint Account.

### III. Peterman Was Subject to Two Trading Blackout Periods.

44. The Conduct Standards mandated that "to reduce the risk of inadvertent violations of securities laws," Comtech's officers and directors were prohibited from trading in Comtech

securities other than during certain open "window periods" tied to the Company's fiscal year quarters.

45. As the Conduct Standards explained, each trading window period—the period when Comtech's officers and directors could trade in Comtech securities—opened on the second business day after Comtech's release of earnings results for the prior fiscal quarter. The trading window closed ten calendar days before the end of the third month of the then-current fiscal quarter.

46. In addition to being subject to the quarterly trading windows set forth in the Conduct Standards, Comtech employees were also subject to special trading blackout periods from time to time.

47. On October 13, 2023, Peterman received an email from Comtech's general counsel notifying him that Peterman and other Comtech officers and directors were subject to a special trading blackout period arising from two confidential Comtech projects ("Special Blackout Period"):

> While Comtech routinely opens the Trading Window for its Section 16 insiders on the second business day following an Earnings Release, we are instead imposing a Special Blackout Period, effective immediately, to avoid any improper transactions while there are nonpublic developments that could be considered material for insider trading law purposes. During this period, you may not trade in Comtech securities without express coordination with the Chief Legal Officer and Corporate Secretary and you may not disclose the existence of the Special Blackout Period to any other person.
>
> We will contact you when the Special Blackout Period is concluded. In the interim, please direct your questions to me directly.

48. Approximately four months later, on February 8, 2024, Comtech's general counsel emailed Peterman and others to remind them of their ongoing obligation to refrain from trading in Comtech securities due to the Special Blackout Period:

9

> The purpose of this email is to alert you to your ongoing obligations in connection with [the confidential projects]. Specifically, the Special Blackout Period that was announced on or about October 13, 2023…remains in effect until you are notified otherwise in writing. Accordingly, you may not trade in Comtech securities without first coordinating with the CLO [Chief Legal Officer] and Corporate Secretary.

49. The Special Blackout Period remained in effect through at least April 1, 2024.

### IV. Peterman Learned of Comtech's Confidential Q2 FY24 Negative Earnings Results Two Weeks Before Comtech Publicly Announced Them.

50. On January 31, 2024, Comtech's Q2 FY24 ended.

51. Under the Conduct Standards, the quarterly trading window for Comtech officers and directors, including Peterman, closed ten calendar days prior to the end of the fiscal quarter, on approximately January 21, 2024, and it would remain closed until the second business day following the release of Q2 FY24 earnings.

52. On March 4, 2024, the Board's Audit Committee held an in-person meeting at Comtech's Melville, New York office to discuss Comtech's Q2 FY24 results, among other things.

53. Peterman was one of the management attendees at this meeting.

54. Peterman attended this meeting in person.

55. During this meeting, Peterman and the other attendees received an oral presentation from Comtech's independent auditors and chief financial officer ("CFO") about Comtech's Q2 FY24 Results.

56. At the meeting, the CFO reviewed the summary of Comtech's Q2 FY24 financial performance and the performance trends compared with Comtech's two prior fiscal quarters.

57. At the same meeting, the CFO discussed the results, key transactions, and other drivers of financial performance for Q2 FY24 .

10

58. The CFO also reviewed, among other things, key highlights from Comtech's consolidated balance sheet and cash flows for Q2 FY24 and cash forecasts, as well as the status of accounts receivable as of the end of Q2 FY24.

59. At the Audit Committee meeting, a written presentation, titled "Comtech Presentation for Audit Committee: Fiscal Year 2024 Second Quarter," was distributed to Peterman and others in attendance.

60. Each page of the written presentation contained a header with the words "PRIVATE AND CONFIDENTIAL – NOT FOR DISTRIBUTION" (capitalization in original) and a footer with the words "Audit Committee Meeting 3/4/2024 (Privileged & Confidential)."

61. The written presentation contained detailed information about Comtech's non-public, forthcoming Q2 FY24 financial results, including multiple pages of excerpts from the company's forthcoming income statements to be published in Comtech's Form 10-Q public filing with the Commission.

62. These excerpts showed that Comtech's net sales during Q2 FY24 were $134.2 million, a 12% decrease from the company's $151.9 million in net sales the prior quarter.

63. These excerpts also showed that Comtech's adjusted EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization) declined more than $3 million from the prior quarter from $18.4 million to $15.1 million.

**V.    Comtech Terminated Peterman for Cause and Reminded Him of His Continuing Confidentiality Obligation.**

64. On March 11, 2024, Peterman was interviewed by Comtech's outside counsel in connection with an internal investigation.

65. During the interview, Peterman acknowledged that he had engaged in a sexual relationship with a subordinate employee over the course of several months in 2023 and that he

had failed to disclose the relationship to Comtech or its Board, including by omitting any mention of this undisclosed sexual relationship in his responses to the Directors and Officers Questionnaire that he signed on October 12, 2023. During the interview, Peterman also acknowledged that in December 2023, he directed the subordinate employee to use his credentials to log in and complete the online annual sexual harassment training required for all Comtech employees.

66. On March 12, 2024, at approximately 5:00 p.m., the independent directors of Comtech's Board effected a Board resolution to terminate Peterman as CEO and chair of Comtech for cause, effective immediately. The directors also appointed a new Board chair and an interim CEO of Comtech.

67. At approximately 6:39 p.m. that evening, the new Board chair and an independent director called Peterman and informed him of his termination for cause, effective immediately.

68. At approximately 7:11 p.m. that evening, Comtech disabled Peterman's access to Comtech's computer network, systems, and email.

69. Later in the evening, at 11:51 p.m., counsel for the Audit Committee emailed Peterman's counsel a letter, dated the same day, from the new Board chair and addressed to Peterman that confirmed Peterman's termination ("Termination Letter").

70. The Termination Letter stated that the Board terminated Peterman's employment "for Cause" because Peterman's conduct constitute[d] "breach of fiduciary duty," "dishonesty," and "material violation of the Company's written policies or codes of conduct," as set forth in the definition of "Cause" in the Employment Agreement.

71. The Termination Letter also stated: "You are reminded that, notwithstanding the termination of your employment, you remain bound to protect the Company's [Comtech's]

confidential information."

## VI. Peterman Tried to Trade Ahead of Comtech's Announcement of His Termination and Did Trade Ahead of Comtech's Earnings Announcement.

72. On Tuesday, March 12, 2024, between 7:33 p.m. and 9:22 p.m., Peterman logged into the online system for his Joint Account three times.

73. At approximately 9:01 p.m. that night, Peterman called his financial advisor for his Joint Account.

74. Approximately one minute later, Peterman sent a text message to the financial advisor: "Call me as soon as you can. It's fairly urgent. Thanks."

75. Peterman and his financial advisor had three telephone conversations lasting more than two minutes each beginning around 9:15 p.m.

76. At approximately 9:28 p.m. the same night, Peterman logged into the online system for his Compensation Account.

77. Eight minutes later, at 9:36 p.m., Peterman emailed the financial advisor for his Joint Account: "Please sell/liquidate all Comtech stock (CMTL) at the first opportunity in the morning. This includes all CMTL holdings in [the Joint Account] and [the Compensation Account]."

78. At approximately 11:17 p.m. the same night, Peterman logged into the online system for his Compensation Account.

79. At approximately 11:20 p.m., Peterman electronically placed a market order to sell all 8,241 shares of Comtech common stock held in his Compensation Account.

80. The next day, Wednesday, March 13, 2024, at approximately 9:00 a.m., Comtech issued a press release announcing Peterman's termination:

> Ken Peterman…has been terminated as President and CEO and will cease to serve on the Board. Mr. Peterman's termination was for conduct

13

       unrelated to Comtech's business strategy, financial results or previously filed financial statements….The Company expects to report its financial results and file its Form 10-Q for the quarter ended January 31, 2024, on March 18, 2024.

81. Six minutes later, at approximately 9:06 a.m., Comtech filed a Form 8-K report, announcing Peterman's termination, with the Commission.

82. When the market opened that morning at 9:30 a.m., Comtech's share price was $5.61 per share, down from $5.76 per share at the close of the prior trading day.

83. Peterman's brokerage firm filled his order to sell all the Comtech shares in his Compensation Account between 9:35 a.m. and 10:00 a.m. that morning at prices ranging from $5.21 per share to $4.71 per share.

84. Peterman's gross proceeds for the sale of the 8,241 shares in his Compensation Account were $40,712.07—a weighted average price of $4.94 per share.

85. Peterman's net proceeds for the sale of 8,241 shares in his Compensation Account were $40,454.54.

86. The same morning, March 13, 2024, at 10:40 a.m., Peterman's financial advisor responded to Peterman's email from the night before at 9:36 p.m.: "I do not have access to sell anything at [the brokerage firm managing the Compensation Account]. You will either need to contact them yourself and ask them to liquidate your shares or put me in contact with them to determine how best to get the shares transferred to [the Joint Account] so that I can execute a sale. Please advise."

87. One minute later, at 10:41 a.m., Peterman called his financial advisor.

88. At 10:44 a.m., Peterman's financial advisor called the brokerage firm that held Peterman's Joint Account.

89. During this recorded telephone call, the financial advisor told a representative at the brokerage firm that held the Joint Account that Peterman wanted to sell all of the Comtech shares in that account, which totaled 49,400 shares of Comtech stock.

90. Approximately three minutes into the call, the financial advisor dialed Peterman into the call.

91. On the call, Peterman told the brokerage firm representative that he had departed Comtech one day earlier, but Peterman did not tell the representative that he was still subject to two Comtech trading blackouts that survived his termination or that he had confidential information about Comtech's forthcoming Q2 FY24 earnings.

92. After this telephone call, at 10:53 a.m., the brokerage firm representative emailed the financial advisor: "Attached are the forms needed for affiliates to sell control shares under Rule 144…. Once the documents are received, we will reach out to the Issuer's legal counsel for pre-clearance & eligibility to sell. Approvals may not be the same day and may take 3-5 business days depending on the company response time."

93. Later on the morning of March 13, 2024, at 11:42 a.m., a representative of the brokerage firm managing the Compensation Account emailed Comtech, with the subject line "KEN A PETERMAN Trade," and wrote: "Our Executive Services Team just informed us that one of your participants Ken A. Peterman…has placed their own transaction."

94. At 12:42 p.m., a Comtech employee responded to the email as follows: "Ken was terminated yesterday as disclosed in an 8-K the company filed with the SEC this morning, and didn't receive permission from in-house counsel to trade."

95. At 12:50 p.m., Peterman sent a text message to the financial advisor: "I signed the release. Just checking in, everything moving ahead all all [sic] right?"

15

96. At 2:37 p.m., the financial advisor responded to the brokerage firm representative's 10:53 a.m. email, copying Peterman: "Thank you for your assistance this morning. Please see attached. Please contact Comtech as soon as possible.

97. Attached to the email was a form Peterman had signed at 11:53 a.m. that day, which memorialized Peterman's intent to sell all 49,400 shares of Comtech common stock from the Joint Account.

98. Also attached to the email was a draft Form 144 to be filed with the Commission reflecting the following Comtech securities to be sold by Peterman: 44,000 shares he had acquired on January 11, 2023, through an open market purchase and 5,400 shares he had acquired on June 13, 2023, through an open market purchase, for a total of 49,400 Comtech shares.

99. On March 13, 2024, at 7:55 p.m., Comtech's general counsel emailed Peterman and others: "If you have received this email directly from me, please be advised that we **remain** under a Special Blackout Period such that **you may not trade Comtech shares.**" (emphasis in original).

100. When the market closed on March 13, 2024, Comtech's stock priced closed at $4.19 per share, a 27.3% drop from the prior trading day's closing price.

101. On March 14, 2024, at 9:58 a.m., the brokerage firm representative emailed Comtech: "We received [Peterman's] request to sell up to 49,400 affiliate control shares under Rule 144. We do understand that Mr. Peterman separated from the company very recently. SEC regulations require transactions [to be] reported for former affiliates until they have ceased their affiliated status for 3 months."

102. The representative asked in his email: "[1] Is the affiliate pre-cleared with

16

[Comtech] to sell shares under Rule 144?[;]" [2] Is the trading window currently open?[;] [and] [3] When does the window close?"

103. On March 14, 2024, at 1:04 p.m., Comtech's general counsel responded to the representative's email: "Please be advised that our Section 16 officers (of which Ken Peterman was one). [sic] We have an active blackout in place prohibiting trades."

104. The next day, Peterman's brokerage firm issued him a check for $40,454.54, the net proceeds of his sale of Comtech shares in his Compensation Account, and Peterman endorsed and cashed the check on March 25, 2024.

105. On Monday, March 18, 2024, at 5:20 p.m., after the market closed, Comtech filed its Form 10-Q, reporting the company's Q2 FY24 results.

106. The Form 10-Q showed that Comtech had earned revenue of $134.2 million, missing analyst estimates that it would earn $152.9 million in revenue for the quarter.

107. The Form 10-Q also showed that Comtech's adjusted EBITDA was $15.1 million, missing analyst estimates that it would be $18.7 million for the quarter.

108. Comtech's stock price fell from $4.60 per share when the market closed on March 18, 2024, before the announcement, to $3.43 per share when the market closed on March 19, 2024, the day after the announcement—a stock price drop of 25.4%.

109. On March 19, 2024, at 11:10 a.m., the brokerage firm representative emailed Comtech's general counsel, writing: "[Peterman's] advisor has requested we reach back out to see if the blackout period has been lifted. If so, would you be able to provide answers to the original due diligence questions? If not would you be able to provide me with an estimate on when the window may open back up?"

110. In response, Comtech's general counsel wrote: "The blackout period has not been

lifted…. The client will be advised when the period is lifted…. The blackout period will not be lifted until the non-public information in the possession of insiders has been cleared."

111.   Had Peterman succeeded in selling all 49,400 Comtech shares in his Joint Account between March 13 and March 18, 2024—before Comtech announced its Q2 FY24 earnings on the evening of March 18—he would have avoided losses ranging from approximately $34,580.00 to $110,463.34, based on the closing price of Comtech stock on March 19, 2024.

**CLAIM FOR RELIEF**
**Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

112.   The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 111.

113.   Peterman, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

114.   By reason of the foregoing, Peterman, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Peterman and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)];

**II.**

Ordering Peterman to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

**III.**

Ordering Peterman to pay civil monetary penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1];

**IV.**

Permanently prohibiting Peterman from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

## V.

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

The Commission demands a trial by jury.

Dated: New York, New York
December 11, 2024

/s/ Antonia M. Apps
ANTONIA M. APPS
REGIONAL DIRECTOR
Tejal D. Shah
Liora Sukhatme
Travis Hill
Mary Kay Dunning
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-5039 (Dunning)